Donahue, J.
The correct solution of the questions presented by the record in this cause depends upon whether sections 2 and 4 of an act of the general assembly of Ohio, passed March 19, 1906, to promote the safety of employes and travelers upon railroads, applies to the facts in this case. Section 2 of that act is now Section 8950, (3365-27b, Revised Statutes) of the General Code and reads as follows: “No such common carrier shall haul, or permit to be hauled or used on its line, a locomotive, car, tender, or similar vehicle used in moving state traffic, not equipped with couplers *221 coupling* automatically by impact, and which can be uncoupled, without the necessity of men going between the ends of the cars.” Section 4 of that act is now Section 8952 (3365-27d‘, Revised Statutes) of the General Code, and reads as follows: "No such common carrier shall use a locomotive, tender, car, or similar vehicle used in the movement of state traffic, that is not provided with drawbars of the standard height, to-wit: Standard gauge cars, thirty-four and one-half inches; narrow gauge cars, twenty-six inches, measured perpendicularly from the level of the tops of the rails to the centers of the drawbars. The maximum variation from such standard heights between drawbars of empty and loaded cars shall be three inches.”
The wisdom of this legislation is very apparent. Railroading at its best is necessarily a dangerous and hazardous employment, and therefore, all legislation looking to the protection of the lives and personal safety of the men engaged in this employment should receive as liberal a construction as the language of the act will permit. True all legislation of this character is in derogation of the common law of negligence and a court is not permitted to read into the act anything that does not come within the clear meaning of the language used therein, but it should be given such liberal construction as will accomplish the purpose and intention of the legislature and courts should frown upon all expediencies and subterfuges em ployed to avoid complying with its requirements. This class of legislation, because of its humane *222 purpose and because of the evils sought to be corrected and avoided thereby, should be strictly enforced by the courts, and courts have given not only a liberal construction, but have vigorously enforced these and similar laws, seeking to protect the person and lives of those engaged in dangerous employment. Schlemmer v. Railway Co., 205 U. S., 1; United States v. Railway Co., 149 Fed. Rep., 486; United States v. Terminal Co., 144 Fed. Rep., 861; Chicago Junction Ry. Co. v. King, 169 Fed. Rep., 372; St. Louis & Iron Mountain Ry. Co. v. Taylor, 210 U. S., 281; Voelker v. Railway Co., 116 Fed. Rep., 867; United States v. Railway Co., 157 Fed. Rep., 893; McGarvey v. Railway Co., 83 Ohio St., 273.
There is no conflict of evidence in this record as to the nature and character of this machine, nor is there any serious conflict as to the uses and purposes to which it was applied by the defendant company.
At the time this accident occurred the plaintiff in error was engaged in the construction of a dock known as Superior Dock, or Dock No. 1, at Ashtabula Harbor. This dock was being built out into Lake Erie with slips for boats to enter, and with a powerhouse and machinery and appliances for unloading and transferring coal and iron ore and other heavy freight. At the time of the injury to plaintiff’s decedent this dock was in process of construction and was not then being used for railroad purposes. It was, however, connected with the defendant’s railway by two tracks extending about a mile from Ashtabula river to Ashtabula Harbor which tracks were used only for *223 bringing timbers, structural iron, stone and other materials to be used in the construction of the dock itself and when it had been constructed to such height as would permit of the same, the defendant' placed tracks thereon for the purpose of enabling it to deliver these materials in the immediate vicinity in which they were to be used in the further construction of the dock. On these tracks located upon the partly constructed dock was the machine described in plaintiffs petition and named therein as a locomotive crane. It appears that this machine was in fact a crane or derrick for handling heavy materials, and was equipped with a steam boiler and engine that furnished it with the power not only to operate the derrick or crane, but also furnished it with power to move about upon the tracks on the partly constructed dock to such places as it was desired to use the same. It also appears that it had sufficient power of locomotion to move at least one loaded railroad car at a time and it was used as occasion required to shift cars loaded with material for use in the construction of the dock from place to place upon the tracks hereinbefore referred to, and it was being so used at the time the accident occurred. It further appears that it was not used by the defendant company in the line of its railroad or for the moving of any cars, except those on the temporary tracks located on the partly constructed dock which were loaded with materials to be used in and about the further construction of such dock, and except for this its sole use and purpose was that of a derrick or crane for handling heavy materials. It also clearly appears from the evidence that it *224 was not equipped with an automatic coupler, nor was it provided with drawbars of standard height.
The United States supreme court in the case of Schlemmer v. Railway Co., 205 U. S., 1, held that the provisions of section 2 of the safety appliance act of March 2, 1893, as amended April 1, 1896, “relate to all kinds of cars running on rails, including locomotive and steam shovel cars.” In that case the steam shovel car was coupled into a train being hauled upon the defendant’s line of railway through the state of Pennsylvania to a point in the state of New York and presented a very different question from the one arising in this case. As further evidencing the liberal construction given by courts to this class of legislation it was held by that court in the same case that, “The object of that statute was to protect the lives and limbs of railroad employes by rendering it unnecessary for the men operating the couplers to go between the ends of the cars and the words ‘used in moving interstate traffic,’ occurring therein are not to be taken in a narrow sense.”
In the case of Chicago Junction Railway Co. v. King, 169 Fed. Rep., 372, it was held that, “There is nothing in the safety appliance acts that limits the classes of persons to whom the carrier shall be responsible for damages that result directly and immediately from its illegal doings.”
In the case of the United States v. Railway Co., 149 Fed. Rep., 486, it was held that, “A carrier operating its own construction train which hauls its own rails and products from a point in one state to a point in another state, is engaged in interstate commerce.”
*225 It would, therefore, appear from tnese and many other decisions not necessary to quote at length, that the courts have taken a broad, liberal and comprehensive view of these statutes, and by such liberal construction have made them efficient to accomplish the object and purposes for which they were enacted, with all of which this court is in full accord.
In this case the evidence shows conclusively that this machine is not one that comes within the ordinary equipment of railroads, and is not one designed for railroad use, but on the contrary that it is an instrumentality provided and used by the company, not on the line of its road, or upon any part of its system, not in any connection whatever with its railroad business, or its duties as a common carrier, but solely and exclusively for the construction of its dock not then a part of the railway system and not then being used for any railroad purpose whatever. The use for which this machine was constructed, and the one that g'ives character to it, was that of a crane or derrick used for handling heavy materials in construction work, and there can be no reasonable contention that while it was used as a crane or derrick that it would come within either the language or the meaning of these sections, nor can it reasonably be contended that the fact that a railway company used this machine for construction work, work entirely separate and apart from its business as a common carrier, and entirely separate and apart from its railway system would bring this machine within the purview of these sections. On the other hand, it is equally ap *226 parent that the railway company might have made such use of this machine that both of these sections would apply.
It is contended on behalf of the plaintiff in error that these tracks connecting the dock in process of construction with its railway system, were temporary tracks, and that the only cars that were hauled over these tracks were those loaded with material for use in the construction of the dock, but neither of these contentions is important in the determination of the questions in this case. If this machine, regardless of the name by which it was known or designated, had been used by the railway company on the line of its road, either for the purpose of a locomotive, or for any other purpose in furtherance of, and as a part of its railway business, then the character of the tracks and nature or ownership of the material with which the cars were loaded would be of little importance, for by such use this machine would come not only within the meaning, but the terms of these statutes requiring automatic couplers and requiring drawbars of standard height.
The evidence of use relied upon by the defendant in error to bring this machine within the operation of these sections is, that after the railway company, as a common carrier, had performed all its duties as such by delivering the loaded cars upon the temporary tracks constructed on the partly built dock, that in furtherance of the construction of the dock this derrick, or crane, was used as the power for shifting these cars to the desired position on the track for unloading, or for *227 moving cars, so that they would not interfere with the unloading of other cars. The fact that the railway company was building its own dock and had not let the construction thereof to a private contractor ought not to cause any confusion in determining the character of the use to which this machine was put. The construction of this dock by the railway company was wholly apart, and wholly separate, from its business as a common carrier, and after the railroad company had deposited these loaded cars upon the partly built dock, its duties as a common carrier were ended, and from that time forward whatever was done in and about the construction of the dock was a totally different enterprise, just as much as if an entirely different company, or contractor, was engaged in this construction, and after these cars had been delivered by the railway company would then take charge of these materials and apply them to their use in the building of this dock. If a private individual had been engaged in this work, this machine would have been just as necessary to his use in this construction as it was to the company’s use, and yet under such circumstances it would hardly be claimed that these sections apply.
This case does not come within the principle, or the reasoning of either of the adjudicated cases hereinbefore referred to. In all of these cases the controversy arose over cars used on the line of the company’s road, or in connection with the railroad business. • This machine was not coupled into the company’s train, was not used on the line of the company’s railway, and was not used in *228 any connection whatever with the company’s business as a common carrier, but on the contrary was used for the sole and only purpose of furthering the construction of this dock, which was then not used by the railway company as a part of its system and not connected therewith except by these tracks for delivering material to be used in the completion of the dock. If the dock had been completed and the railway company had then been using the same as a part of its system and employing this crane or derrick in the furtherance of its business to move the cars about upon the dock to be unloaded into the boats or loaded from the boats, a very different question would be presented.
It may be that from the nature and construction of this machine it was not a proper instrument to use for the moving of loaded cars in and about this construction work, but whether it was proper or not for this service, the liability of this company for using the same separate and apart from its railroad business, and in and about an entirely different enterprise than the operation of its railroad, cannot be measured by any other rule or standard than the liability of any other employer not a common carrier engaged in a similar work.
For these reasons the common pleas court erred in refusing to give, before argument, the first, second and third requests of the plaintiff in error, and erred in stating in its general charge to the jury that this machine came within the operation of Section 3365-27b, Revised Statutes, and Section 3365-27d, Revised Statutes, and for these errors the judgment of the common pleas court and the judgment *229 of the circuit court affirming the same are reversed and cause remanded to the common pleas court for further proceedings according to law.

Reversed.

Davis, C. J., Shauck, Price and Johnson, JJ., concur.