UNITED STATES v. NORTHWESTERN PAC. R. CO.

(District Court, N. D. California, Second Division.   July 31, 1916.)

Nos. 15897, 15952.

1. RAILROADS ⬯229—SAFETY APPLIANCE ACT—LOGGING CARS.
   While the federal Safety Appliance Act of March 2, 1893, c. 196, § 6, 27 Stat. 532, as amended by Act April 1, 1896, c. 87, 29 Stat. 85 (Comp. St. 1913, § 8610), declares that nothing in the act contained shall apply to trains composed of four-wheel cars, or to trains composed of eight-wheel logging cars, where the height of such cars from the top of the rail to the center of the coupling does not exceed 25 inches, the act applies to standard eight-wheel flat cars, though used exclusively for the transportation of logs, where the height of such cars from the top of the rail to the center of the coupling exceeds 25 inches.
   [Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. ⬯229.]

2. RAILROADS ⬯254(2)—SAFETY APPLIANCE ACT—CONSTRUCTION—"PERMIT."
   Where a railroad company engaged in interstate commerce allowed a lumber company to operate over a portion of its tracks lumber trains, which were not equipped in accordance with the federal Safety Appliance Act, imposing penalties on railroad companies engaged in interstate commerce which haul, or permit to be hauled over their tracks defectively equipped trains, the railroad company is liable for the penalty, though trains were under the exclusive control of the servants of the lumber company, and it exercised no supervision other than to control the movement

of such trains by its own dispatchers, and to 'require those in charge to acquaint themselves with the company's time-table, for the word "permit" should not be construed in its ordinary significance as implying knowledge of the thing permitted, as the statute, being remedial, should be given such a construction as will give effect to the intention of Congress.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 765, 766, 768; Dec. Dig. ☞254(2).

For other definitions, see Words and Phrases, First and Second Series, Permit.]

At Law. Actions by the United States of America against the Northwestern Pacific Railroad Company. Judgments for plaintiff.

E. F. Jared, Asst. U. S. Atty., of San Francisco, Cal., and Roscoe F. Walter, Sp. Asst. U. S. Atty., of Washington, D. C., for the United States in No. 15897.

E. F. Jared, Asst. U. S. Atty., of San Francisco, Cal., and Monroe C. List, Sp. Asst. U. S. Atty., of Washington, D. C., for the United States in No. 15952.

Stanley Moore and C. J. Goodell, both of San Francisco, Cal., for defendant.

VAN FLEET, District Judge. These cases involve alleged infractions by the defendant of the federal Safety Appliance Act of March 2, 1893 (27 Stat. L. 531 [Comp. St. §§ 8605–8612]), as amended Act April 1, 1896 (29 Stat. L. 85 [Comp. St. 1913, § 8610]), and Act March 2, 1903 (32 Stat. L. 943 [Comp. St. 1913, §§ 8613–8615]). While not tried together, they have been submitted on the same argument and briefs, and as the principal question in each is common to both, they may be disposed of in one opinion.

There is no controversy as to the defendant being a corporation engaged in interstate commerce and subject to the requirements of the act, nor as to the fact of the existence of the several defects in the equipment as alleged and counted upon in both actions, the only controversy arising over the questions: (1) Whether it was being employed for a purpose such as to bring it within the act; and (2) in a manner to render defendant responsible for such use.

[1] 1. The first three counts in case No. 15897 cover the use on defendant's road of three of its own cars under these circumstances: The Bayside Lumber Company, a patron of defendant, with its mills near Eureka, carried on logging operations about 3 miles from defendant's line, with which they connected by their own service track at a point called Mannons Creek, about 25 miles from Eureka; the cars in question were part of a number set aside by defendant to the lumber company for its use in hauling logs from the logging camp; they were not regular logging cars, but flat cars of standard gauge and make, equipped, while so used, with transverse "cradles," or "bumpers," for holding logs. The defendant would deliver these cars empty to the lumber company at Mannons Creek, where the latter would receive, load, and return them to the junction, and the defendant would then take and deliver them over its line at the mills near Eureka. It was while in pursuance of this arrangement between the lumber company and the defendant the cars in question were being hauled over de-

fendant's line in one of its own trains, and in control of its employés, that the defects counted upon were shown to exist.

The only thing in the nature of a defense advanced by defendant to shield itself from liability for use of these three cars in the defective condition shown is the claim that, as they were being used exclusively at the time for the transportation of logs, they were exempted from the operation of the Safety Appliance Act by the proviso to section 6 (as amended in 1896, 29 Stat. L. 85), which reads:

"Provided, that nothing in this act contained shall apply to trains composed of four-wheel cars or to trains composed of eight-wheel standard logging cars where the height of such car from top of rail to center of coupling does not exceed 25 inches, or to locomotives used in hauling such trains when such cars or locomotives are exclusively used for the transportation of logs."

But the statement of the claim, in view of the language of the proviso, discloses its utter futility. The fact that the cars were at the time being used for the transportation of logs is not enough. The statute excludes only "standard logging cars where the height of such car from top of rail to center of coupling does not exceed 25 inches." These cars, as noted, were not of that character, but were standard flat cars having, as the evidence shows, a height in the respect mentioned of 34 inches. The act makes the one condition as essential to the exemption as the other, and it is not for the court to give it a construction which would defeat the legislative intent so plainly and explicitly expressed. Assuming, therefore, that the character of use here being made of these cars was such as would bring them within the category of cars "exclusively used for the transportation of logs," within the contemplation of the act (see Spokane, etc., R. R. Co. v. United States, 241 U. S. 344, 36 Sup. Ct. 668, 60 L. Ed. 1037, United States Supreme Court, June 5, 1916), a thing it is not necessary to decide, the lack, in the essential feature pointed out, must necessarily exclude them from the protection of the proviso.

[2] 2. The remaining six counts in No. 15897 and the first five counts in No. 15952 (No. 6 not being involved) fall within one and the same category under the defense made. They all cover the use of defective cars, excepting only No. 9 in 15897, which alleges the movement of a defectively equipped train. For the reason above stated it is not essential to specify the character of the various defects alleged, there being no controversy as to their existence; the defense involving solely a question of defendant's responsibility therefor by reason of the circumstances. Excepting as to the particular equipment specified in each, all these counts are precisely similar in their purport, charging that the defendant on the particular date "permitted to be hauled," as alleged in some, or "permitted to be used or hauled," as charged in others, "over a part of a through highway of interstate commerce," etc., the particular unit of equipment counted upon. The movement of all the equipment covered by these counts at the dates alleged was had under and in pursuance of an operating or traffic agreement between the defendant and the Pacific Lumber Company, whereby the latter was permitted to use the main line of defendant's road between the stations of South Bay and Scotia, a distance of some

22 miles, for the passing back and forth to and from its mills of the trains of the lumber company in the transportation of its products. These trains carried no passengers, the lumber company not being a common carrier of either passengers or freight, but were made up exclusively of standard flat cars used in carrying its own output of lumber. The cars, engines, and other equipment were the property of the lumber company, and were operated immediately by its employés, but in the movement of its trains over defendant's line they were at all times under the control and direction of the latter's dispatchers and operating officials, and were required to acquaint themselves with the time-table issued by the defendant for the government of its own employés, and to follow the rules, orders, and directions contained therein; and no train of the lumber company could move over defendant's line without first receiving authority therefor from defendant's operating officials, but when not on such line were wholly within its own control.

The lumber company maintained its own yards and repair shops, and its equipment was not inspected by defendant's operatives, but exclusively by its own servants. It ran regularly about two trains a day each way over the part of defendant's line covered by the contract. The defendant's contention is that under these facts it is not to be held responsible for the defects complained of, its theory being that the act in question is intended only for the protection of employés of common carriers, and that the provision of section 6, "that any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this act shall be liable," etc., has reference solely to such acts when done, or permitted to be done, by the carrier on its own road and through its own employés, over whom it has control, and does not include acts done on its line by one over whose equipment and employés it has no such control. In this respect it is urged:

The theory of the act and the intention of Congress was that the railroads should be held liable for any failure to render the employment of their trainmen as safe as possible. In all the decisions which have been rendered under this act the railroads directly operating the trains of cars in which the equipment was found were held liable for the defect. It was their employés who were exposed to the risk.

And it is further said:

A corporation can act only through its officers, agents, and employés. It can prevent defective cars from being hauled only by reason of the diligence and care of its employés. When the care and control of the equipment is in the hands of another company, whose employés make up the train, inspect the cars, and have entire charge of their operation, the first company, which merely owns the tracks, has not the power to prevent the second carrier from using defective equipment. There is nowhere in the act any provision giving one carrier the right of control over the employés of another, and the purpose of the act is not to make one carrier responsible for the dangers to which another carrier's employés might be exposed.

But this narrow view of the purpose of the act does not accord with the construction given it by the Supreme Court. Johnson v. Southern Pacific Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. The

dangers to be apprehended from defective equipment reach beyond the immediate operatives and employés of a carrier. They include as well the safety of the traveling public. While the first consideration may have largely actuated the enactment of the law, the latter was not lost sight of by Congress, and the language of the act clearly sustains this view. It is sufficiently broad to comprehend both. When Congress forbade the "hauling or permitting to be hauled or used" any such defective equipment, it very evidently intended to exclude any permissive use in derogation of the dangers sought to be guarded against, not only as to employés, but to the public, and to make the carrier permitting such use responsible therefor. And certainly there is no hardship in imposing such responsibility in an instance like the present. It is not the case of one common carrier permitting the use of its lines by another carrier equally answerable for a violation of the act, but a permission to one not itself subject to the law to employ the same dangerous instrumentalities free from any responsibility for their defective character. For the lumber company, not being a common carrier, is not within the category of those subject to respond for its violation. It would have been a very reasonable and proper precaution for the defendant in its contract, not only for its own protection but that of the public as well, to have provided for its right to inspect the cars and other equipment of the lumber company, to the end that their condition and appliances could be known to it to be such as to conform to the law. But it did not do so, and it is invoking no harsh rule to say that under such circumstances it should be held responsible for the defects complained of. In other words, the circumstances are such that, if necessary, the equipment of the lumber company must, for the purposes of this act, be deemed the equipment pro hac vice of the defendant. Certainly it would be a strong thing to say that responsibility for the violation of this act could be so readily evaded as by an arrangement such as here shown.

It is further strenuously urged at considerable length that the verb "permit" as employed in the phrase "hauling or permitting to be hauled," etc., in section 6, is to be construed in accord with the popular and common use of the word as implying knowledge of the thing permitted, and that accordingly the act should be understood as requiring knowledge by the carrier "that the cars hauled over its rails are in fact defective"; in other words, that the statute should be read as if the qualifying word "knowingly" were inserted therein just before the word "permitted." It is sufficient to say in response to this contention, without following the argument in all its ramifications or specially noticing the citations in its support, that it is definitely met and concluded by the authoritative construction heretofore given the statute. St. Louis, Iron Mountain Ry. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 616, 52 L. Ed. 1061; C., B. & Q. Ry. Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582. These cases hold that the duty of carriers to exclude the use on their lines of defective equipment is absolute, and not limited to the exercise of reasonable care for the purpose, and that the question of knowledge of such defects is wholly immaterial; that, as stated in the last case:

Where a statute commands that an act be done or omitted which in the absence of such statute might have been done or omitted without culpability, ignorance of the fact or state of things contemplated by the statute, it seems, will not excuse its violation.

And statutes of similar purpose have received like construction. United States v. Oregon-Washington R. R. & Nav. Co. (D. C.) 213 Fed. 688, affirmed on appeal 223 Fed. 596, 139 C. C. A. 142. And see Commonwealth v. Curtis, 9 Allen (Mass.) 266.

The act is highly remedial, and should be construed with the degree of liberality which will tend to effectuate rather than defeat the intent of Congress and its beneficent purpose. Johnson v. Southern Pacific Co., supra.

In accordance with these views, judgment must go for the plaintiff in each case upon the counts involved therein, respectively, and for its costs.

Special findings, having been requested, may be prepared and presented in due course.