### DELAWARE & HUDSON CO. v. UNITED STATES.

(District Court, S. D. of New York. May 26, 1925.)

**I. Constitutional law ⬳62—Congress, having declared rule that railroads may be required to install automatic train-stop and train-control devices, may leave application to Interstate Commerce Commission.**

As general proposition, Congress cannot delegate legislative power to Interstate Commerce Commission, but may delegate to that commission application of general rules legislatively prescribed to particular situations, and held, Congress, by Interstate Commerce Act. § 26, as added by Transportation Act 1920, § 441 (Comp. St. Ann. Supp. 1923, § 8596b), having described rule that railroads may be required to install automatic train-stop and train-control devices, may leave application of it, consisting of choosing railroads and devices and laying down specifications and requirements, to Commission.

**2. Railroads ⬳231—Order of Interstate Commerce Commission, requiring automatic train stop, held not based on insufficient investigation.**

That order of the Interstate Commerce Commission, requiring railroad's installation of automatic train-stop and train-control devices, and accompanied by long and fact-finding report or opinion, did not refer to complaining railroad by name, held not to excuse railroad from compliance with order, on ground that Commission's action was based on insufficient investigation of petitioner's needs and requirements.

**3. Railroads ⬳231 — Interstate Commerce Commission's order, requiring automatic train stop, not invalid as requiring expenditures for experimental purposes.**

Order of Interstate Commerce Commission, requiring certain railroads to install automatic train-stop and train-control devices, held not invalid because it amounted to requiring railroad to expend capital for experimental purposes.

**4. Railroads ⬳231—Railroad held entitled to two years within which to comply with order of Interstate Commerce Commission requiring automatic train stop.**

Under Interstate Commerce Act, § 26, as added by Transportation Act 1920, § 441 (Comp. St. Ann. Supp. 1923, § 8596b), authorizing Interstate Commerce Commission to require railroads to install automatic train-stop and train-control devices, such order to be issued and published at least two years before date specified for its fulfillment, and Interstate Commerce Act, § 16a, as added by Act June 29, 1906, § 6 (Comp. St. § 8585), authorizing Commission to grant rehearing, and reverse, change, or modify an original decision, where commission, after ordering installation of automatic train-stop and train-control devices, which should be independent of any manual control, on rehearing, more than a year and a half later, modified order to permit use of devices changing element of manual or enginman's control, held, railroad could not be put in default for failure to comply with such order until two years after date of its modification; modified order constituting new order.

In Equity. Suit by the Delaware & Hudson Company against the United States, wherein the Interstate Commerce Commission intervened. On motion for preliminary injunction. Motion granted in part.

Motion for preliminary injunction suspending and restraining the enforcement, operation, and execution of three separate

orders of said Interstate Commerce Commission, dated, respectively, June 13, 1922, December 26, 1922, and July 18, 1924, all relating to the installment of automatic train-stop or train-control devices upon the lines of petitioner and other common carriers. The petition herein having been verified December 30, 1924, an order to show cause why preliminary injunction as above stated should not be granted was obtained January 2, 1925, returnable January 15, 1925. By consent of parties, hearing was had March 27, 1925, at which time petitioner filed certain affidavits in support of its motion. Time was given to respondents to file answering affidavits, if desired, but on April 3, 1925, respondents notified the court that they would not answer said affidavits.

Uncontradicted facts are that, by Transportation Act 1920, § 441 (41 Stat. 498, 499), section 26 of the Interstate Commerce Act was added and made to read as follows: "That the Commission may, after investigation, order any carrier by railroad subject to this act, within a time specified in the order, to install automatic train-stop or train-control devices or other safety devices, which comply with specifications and requirements prescribed by the Commission, upon the whole or any part of its railroad, such order to be issued and published at least two years before the date specified for its fulfillment." Comp. St. Ann. Supp. 1923, § 8596b. For failure to obey such an order a penalty of $100 for each day of refusal or neglect is imposed by the same section.

By section 16a of the Interstate Commerce Act (as added by Act June 29, 1906, § 6, 34 Stat. 592, 593 [Comp. St. § 8585]) it was provided that, after a decision, order, or requirement has been made by the Commission it shall be lawful for the Commission to grant a rehearing, and if after such hearing it shall appear that the original decision, etc., was unwarranted, "the Commission may reverse, change, or modify the same accordingly. Any decision, order, or requirement made after such rehearing, reversing, changing, or modifying the original determination shall be subject to the same provisions as an original order."

For a considerable number of years, beginning at least as early as 1907, various boards or investigating authorities were busied in studying the subject of train-stop and train-control devices. It was after years of such investigation that the powers contained in the above-cited section 26 were granted by Congress to the Interstate Commerce Commission, which continued investigation and experimentation of and concerning the devices mentioned. All these devices amount to some scheme of automatically stopping or slowing a power-driven train of cars, when it moves at all or moves too fast on a section of track on which any movement or such speed is by prearrangement of signals forbidden.

Known and existing devices of this nature may be subdivided into several classes, but the classification important here is that a train-stop system may be completely beyond the control of the engineer of the train or of any operator along the right of way. If so arranged, it stops or slows the train, if the prearranged conditions exist, automatically, certainly, and unchangeably, if it works at all. Such a system is spoken of as one "without manual control." But the same system may also be so arranged that the engineman, knowing that he is approaching a portion of track where a stop or slow system is established, may forestall the operation of the system upon his train, in which case he will pass the place where the stop or control system is installed without any interference with the speed of his train, other than that entailed by attention to various and usual signals.

The Commission's order of June 13, 1922, directed that a large number of carriers, including petitioner, should upon certain specified portions of their tracks install a train-stop or train-control device, and make such installation on or before January 1, 1925. This order, made under the provisions of section 26, supra, sets forth the "specifications and requirements" prescribed by the Commission, and they are given wholly in terms of result or function; i. e., the various carriers, which are instructed under penalty to put in some system, are only told to produce certain results by whatever system they install.

A study of these "specifications and requirements" shows that the carriers were given 2½ years within which to make up their minds as to what device they would choose, and there were a considerable number of devices that they might choose from that would come within the limitations imposed by the Commission, but one thing that they could not do was to put in any system that was subject to manual control by the engineman. The order of June 13, 1922, was accompanied by a long and fact-finding report or opinion, and this question of manual control is treated at length. In this report or opinion the Commission concludes flatly that it

will not permit any system to be installed subject to manual control.

By the order of December 26, 1922, this petitioner procured a change of that part or section of its road which was to be equipped with a train-stop or train-control device, and by the order of July 18, 1924, the Commission decreed that upon further consideration of the record it excused a very considerable number of carriers from complying with the order of 1922, and then changed or modified said order by specifically permitting the introduction of automatic train-stop devices "under control of the engineman, who may, if alert, forestall the application of the brakes by the automatic train-stop device, and control his train in the usual manner in accordance with" the operating rules of the company. Thereupon this petitioner petitioned the Commission for relief from said orders and all of them. The Commission denied any relief on December 30th, and thereupon this proceeding was begun, as above indicated.

Walter C. Noyes and H. T. Newcomb, both of New York City, for petitioner.

Blackburn Esterline, Asst. Sol. Gen., of Washington, D. C., for the United States.

P. J. Farrell and R. Granville Curry, both of Washington, D. C., for Interstate Commerce Commission.

Before HOUGH and HAND, Circuit Judges, and BONDY, District Judge.

PER CURIAM. The issues presented by this motion may be summarized thus:

(a) Section 26 of the statute is an unconstitutional attempt to delegate legislative power.

(b) The action of the Commission was not based upon any special investigation of petitioner's needs or requirements and was therefore arbitrary.

(c) The orders really do no more than require petitioner and others to experiment at their own charges with devices of an untried nature and doubtful utility.

(d) The order of July 18, 1924, was in substance a new order with new requirements, and the Commission had no power under the statute to require compliance with that order within less than two years from its date.

[1] (a) No one doubts the general proposition that Congress cannot delegate purely legislative power to a commission. Interstate Commerce Commission v. Goodrich, etc., Co., 224 U. S. 194, 32 S. Ct. 436, 56 L. Ed. 729. But equally is it beyond question that the Legislature can delegate to a commission the application of general rules legislatively prescribed to particular situations as ascertained by commissions.

Of course the subject-matter committed to the Commission must be within the power of Congress, and surely the regulation of interstate and foreign commerce is as thoroughly within congressional authority as anything can be. Wherefore any question as to the constitutionality of this statute is limited to the inquiry whether Congress has laid down any general rules and left to the Commission the application of the rules so made, or whether Congress has avoided the making of any rules and left their manufacture wholly to the Commission.

We think it plain that Congress has prescribed sufficiently a rule, to wit, that railroads may be required to install "automatic train-stop or train-control devices or other safety devices." That is the rule. The application of it consists in choosing what railroads shall install such devices, and laying down specifications and requirements for such installation; and this is left to the Commission. On reason, we see no objection to this procedure. On authority, the matter is quite within St. Louis, etc., Railway v. Taylor, 210 U. S. 281, 28 S. Ct. 616, 52 L. Ed. 1061; Union Bridge Co. v. United States, 204 U. S. 364, 27 S. Ct. 367, 51 L. Ed. 523; Avent v. United States, 266 U. S. 127, 45 S. Ct. 34, 69 L. Ed. ——.

[2] (b) We can hardly think the complaint serious that in the Commission's reports of June 13, 1922, and July 18, 1924, this petitioner "is nowhere referred to by name." No reason appears why this or any other carrier should be referred to by name. The serious inquiry is whether there are findings of fact made by the Commission on the subject of these stop or control devices, which on their face are based upon evidence. It would serve no useful purpose to go through the findings of fact in detail. It is enough to state the inferences that we draw from a perusal of these reports.

We are informed by the opinions of the commissioners that there are numerous and differently constructed devices for train control. They are made by incorporated companies competing with each other for business, and that competition largely consists in as nearly as possible procuring the favor of the Commission for a style of device which would let in say one manufacturer and exclude as many of his competitors as possible. There is no one style of device which has met with the approbation of the majority of railway corporations. In fact, rail-

way opinion is not very friendly to devices which wholly or partially do at times take the control of trains out of the hands of men who have spent their lives in learning to manage them. Yet there is plainly a substantial and growing body of opinion, even among railway operators, that a practicable system of train control is near at hand, and sufficiently near so that a prudent railway manager, who wishes to keep up with the times, would incur no blame for putting in at least experimentally a system of train control or stoppage.

We have stated in a manner perhaps ultra favorable for plaintiff's contention the impression made upon us by the recital of evidence set forth in the Commission's reports, plus the statements of plaintiff's affidavits. It seems to us too plain for discussion that such a situation is one that most plainly requires the intervention of an impartial commission or other fact-finding powerful body to push the matter forward, for no progress will be made if accord is waited upon. Some one must decide the matter both in gross and in detail. Congress has decided it in gross, and it had power to say that the Commission should decide it in detail, and we are of opinion that the Commission has decided in substance the necessary details, to wit, that what has been done during the last 15 years has "demonstrated the practicability of and the necessity for automatic train stops or train control."

[3] (c) The assertion under this head of argument is that "Congress never intended and would never have power if it did so intend to require expenditures of railway capital for experimental purposes." As a proposition of law we cannot accept this, and deem the statement so unsound as to call for some discussion.

In the whole field of human effort there is no one definable department that requires experiment for advancement more plainly than does transportation. And it is also true that, when it comes to such a scheme as that of automatically controlling the movements of huge trains normally running at high speed, no experiment is possible, except on the railways themselves, under actual traffic conditions.

Thus the argument amounts to this: That no railway can be compelled to conduct experiments, although there is no other place to experiment, and no change in existing conditions can be made until experiments are concluded to the point of demonstration. This is merely untrue. It is really the same argument by which efforts have been made

to sidetrack any of the other efforts at improvement stated and declared by Congress and carried out through the Commission; for example, all the safety appliance statutes, hours of service acts, and the like.

[4] (d) The effect of the Commission's order of July 18, 1924, was this: That whereas, for two years, certain of the railroads of the country had been told to make a choice of a certain number of train-stop or control devices, after that date they were given the option to affect any one of said devices with the element of manual or engineman's control; and for all that appears the problem of affecting one kind of device with manual control was an entirely different problem from that of affecting any of the other devices similarly. It is probably true that, if there were, say, a choice of four kinds of control before July 18, 1924, there were eight kinds to choose from after that date.

To call such a change in the effect of an order a mere amendment is unfair, if not absurd. It was a new order, and a wholly new choice. How new is plainly shown by the opinions of 1924, which frankly eat a great many of the words used in 1922. To such a situation the two-year clause of section 26 plainly applies.

The plaintiff petitioner may take an injunction against prosecution or other effort to enforce any penalties for failure to install manual control or permissive train-stop or train-control devices before July 18, 1926. In every other respect, the motion for injunctive relief is denied.