## HOLDER *v.* AULTMAN.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

No. 109. Argued November 8, 9, 1897. — Decided January 10, 1898.

Under a statute of a State, imposing a franchise tax on foreign corporations doing business in the State without having filed articles of association under its laws, and providing that "all contracts made in this State" after a certain date, "by any corporation which has not first complied with the provisions of this act, shall be wholly void," a contract of such a corporation, signed by its local agent and by the other party within the State, and stipulating that the contract is not valid unless countersigned by its manager in the State, and approved at its home office in another State, is not "made in this State," within the meaning of the statute, even if it is to be performed within the State.

THIS was an action of assumpsit, brought September 21, 1894, in the Circuit Court of the United States for the Eastern District of Michigan, by Aultman, Miller & Co., a corporation of the State of Ohio, against William Holder, a citizen of the State of Michigan, to recover the price of agricultural machines furnished by the plaintiff to the defendant, and sold by the defendant, under a contract in writing, the material parts of which were as follows:

"This agreement, made this 20th day of February, 1894, between Aultman, Miller & Co., a corporation duly incorporated under the laws of the State of Ohio, of Akron, Ohio, of the first part, and William Holder, of Laingsburgh, county of Shiawassee, and State of Michigan, of the second part, witnesseth, That the party of the second part is hereby authorized to sell Buckeye mowers, reapers and binders and extra parts thereof in the following territory, viz., Laingsburgh and vicinity," and other specified territory in Michigan, "for and during the season of 1894, on the following terms and conditions, viz. :

"The party of the second part agrees: First. To use all reasonable diligence in canvassing and supplying said terri-

tory with said machines." Second. "To sell the said machines at the retail list prices authorized by said first party;" "to grant credit to such persons only as are of well known responsibility;" "to see that all notes taken for machines sold are drawn on blanks furnished by the said first party;" "and, in all cases of doubt as to the responsibility of the purchaser, to require a mortgage on property, real or personal;" and to redeem all notes not accepted by the party of the first part. Third. To endorse, unless sufficiently secured, "all notes given by renters and parties owning no real estate." Fourth. "That all machines and parts of machines, and all other goods received on commission under this contract, shall be held by the said second party on special storage and deposit as the property of the party of the first part until converted into notes or money," and such notes shall remain the property of the first party; and, "in all cases where machines are sold for cash, or part cash and notes, all such cash received shall be promptly remitted." Fifth. "To see that all machines sold are properly set up and started;" and "to keep a correct record of sales." Sixth. To receive all "goods shipped or delivered on account of said first party;" to pay the freight on them, and keep them insured; "to keep all unsold goods well housed and cared for, subject to the order of the party of the first part;" and to make no charge for handling or storage. Seventh. To furnish "repairs, free of charge, to customers," only in case of flaw or defect. Eighth. "To make prompt and accurate reports of machines on hand, as often as requested by the first party or its general agent; to promptly execute orders for transfer of machines, if any are on hand unsold; and, in case of failure to make such report or transfers, to pay said first party, for all machines remaining on hand at settlement unsold by reason of such failure, at the option of said first party." Ninth. "To sell, or assist in the sale of, no other mowing machines, or combined mowing and reaping machines, or harvesters and binders, in said territory, during the continuance of this contract." Tenth. "To sell and deliver all machines set up and used as samples, or settle for same in cash or approved notes at settlement time." Eleventh. To advertise this agency.

"The party or the first part further agrees with the party of the second part: First. To furnish to said second party such machines of the kinds they make as may be wanted to supply said territory, so long as their stock on hand will enable them to fill the orders. No commission will be allowed on orders taken and not filled;" "nor shall any commission whatever be due said second party until a full settlement of account is made." Second. "To allow said second party as compensation for receiving, handling, storing, selling, setting up and starting machines, and making collections whenever required," certain specified commissions. Third. "To furnish the said second party a stock of extra castings and other repairs," to be sold on commission. Fourth. "To sell the said second party knives and sickles," and certain other things, at a discount of fifty per cent. Fifth. "To furnish said second party blank notes, orders, circulars and posters, and such other printed documents as they are accustomed to supply their agents.

"NOTICE. — It is especially agreed that when sales have not been closed by cash or notes on or before delivery, as stated above, then the party of the first part may send a person to settle with the purchasers of machines, and the party of the second part shall pay all the expenses of making such settlement. It is further agreed that Aultman, Miller & Co. shall not be held liable under any written or printed warranty given by them on their machines that are allowed to go out without first having been settled for. No canvassers or expert that may be sent to aid you shall have any authority to make any change whatever in our contract with you; and all sales made by him will be subject to your approval or rejection, as no allowance will be made to you for loss of interest or reduction in price on sales made by him; nor will any promise not authorized in writing by our manager at Lansing, Michigan, be recognized at settlement."

"In witness whereof, the parties hereunto have set their hands the day and date above written.

"AULTMAN, MILLER & CO.,
"By D. C. GILLETT.

" This contract not valid unless countersigned by our mana-
ger at Lansing, Michigan, and approved at Akron, Ohio.

" WM. HOLDER.

" Countersigned, Lansing, Michigan, Feb. 27, 1894.

" R. H. WORTH, Manager."

Across the back of the contract were written these words:

"Approved April 29, 1894. IRA M. MILLOY, Secretary."

The declaration alleged that " on February 27, 1894, at
the said village of Laingsburgh and at the city of Lansing, in
the Eastern District of Michigan, the said plaintiff, by D. C.
Gillett and R. H. Worth, its duly authorized agents, entered
into a written contract with the defendant, William Holder,"
above stated; and that " afterwards, to wit, on April 27, 1894,
the said written contract was approved by the plaintiff at its
office in the city of Akron, in the State of Ohio, and the same
then and there became and was a binding and valid contract
between the defendant and the plaintiff, according to the
terms thereof, to wit, at the city of Lansing, in the Eastern
District of Michigan; " that the plaintiff faithfully performed
its contract, and in pursuance thereof shipped to the defend-
ant a large number of mowers, reapers and binders, and extra
parts for the same; and the defendant sold them under the
contract, and became liable to pay the plaintiff the sum of
$5052.56; and had never paid him that sum, or any part
thereof. The declaration, besides a count on the contract,
contained the common counts.

The defendant relied on the statute of Michigan of 1891, c.
182, § 1, as amended by the statute of 1893, c. 79, and copied
in the margin;[1] and alleged that the contract sued on was

---

[1] An act to amend section one of act number one hundred and eighty-
two of the public acts of eighteen hundred and ninety-one, entitled " An
act to provide for the payment of a franchise fee by corporations," ap-
proved July two, eighteen hundred and ninety-one.

SECTION 1. The People of the State of Michigan enact, that section
one of act number one hundred and eighty-two of the public acts of
eighteen hundred and ninety-one, entitled " An act to provide for the pay-

made and to be performed in the State of Michigan, within the meaning of the statute; that the plaintiff, being a foreign corporation, was at the time of the execution of that contract doing business in the State of Michigan, within the meaning and application of the statute, and had not complied with its requirements; and that the contract was therefore absolutely void and without force as against the defendant.

The parties waived in writing a trial by jury, and submitted the case to the decision of the court, which found the following facts:

On April 29, 1894, the parties entered into the contract above stated; and it was executed, accepted and approved,

---

ment of a franchise fee by corporations," approved July two, eighteen hundred and ninety-one, be and the same is hereby amended so as to read as follows:

SECTION 1. The People of the State of Michigan enact, that every corporation or association hereafter incorporated or formed by consolidation or otherwise, by or under any general or special law of this State, which is required by law to file articles of association with the secretary of state, and every foreign corporation or association which shall hereafter be permitted to transact business in this State, which shall not, prior to the passage of this act, have filed or recorded its articles of association under the laws of this State and been thereby authorized to do business therein, shall pay to the secretary of state a franchise fee of one half of one mill upon each dollar of the authorized capital stock of such corporation or association, and a proportionate fee upon any and each subsequent increase thereof, and that every corporation heretofore organized or doing business in this State, which shall hereafter increase the amount of its authorized capital stock, shall pay a franchise fee of one half of one mill upon each dollar of such increase of authorized capital stock of such corporation or association, and a proportionate fee upon any and each subsequent increase thereof: Provided, that the fee herein provided, except in cases of increase of capital stock, shall in no case be less than five dollars; and in case any corporation or association hereafter incorporated under the law of this State, or foreign corporation authorized to do business in this State, has no authorized capital stock, then in such case each and every corporation or association so incorporated or doing business in this State shall pay a franchise fee of five dollars. All contracts made in this State after the the first day of January, eighteen hundred and ninety-four, by any corporation which has not first complied with the provisions of this act, shall be wholly void.

This act is ordered to take immediate effect.

Approved May 13, 1893.

as set forth therein, and in the indorsement thereon. Its provisions, so far as the plaintiff is concerned, have been fulfilled ; and there is a balance due to the plaintiff under it of $5052.56. The plaintiff is a corporation organized and existing under the general laws of Ohio, having its corporation office and its manufactory at Akron in that State ; and does not manufacture any goods in the State of Michigan. It sells its goods in Michigan by means of local commission agents, and has a general agent at Lansing in Michigan ; its commission agents are under contracts with it similar to that sued on ; and all contracts are sent to the plaintiff at Akron, for approval or rejection, before taking any effect. The goods manufactured by the plaintiff at its factory in Akron, and sold by it in Michigan, are shipped from the factory upon orders received from commission agents and forwarded by the general agent from Lansing to Akron. Goods are shipped, either directly to the commission agent, or in bulk to Lansing or elsewhere in Michigan, and reshipped in smaller lots to the commission agents. The plaintiff owns a warehouse in Lansing for the transfer of such reshipments, for the temporary storage of a small stock of extras or repairs, which experience has shown may be suddenly needed by customers throughout the State during the harvest season. Some of the commission agents throughout the State also keep on hand a very small stock of repairs for the immediate use of their customers. These are partly commission goods, and partly goods sold directly to them. Accounts with every commission agent in Michigan are kept at the plaintiff's office in Akron. The plaintiff effects settlements with its commission agents by sending copies of such accounts to its general agent, who goes over the season's work with each commission agent, collects the cash and notes taken in payment for machines sold, and forwards them to the plaintiff at Akron, subject to the plaintiff's approval or rejection of the notes. The notes are filed and kept by the plaintiff at Akron until just before maturity, when they are sent to the bank or to express agents for collection and remittance to Akron. The plaintiff has never filed a copy of its articles of association in the office of the

secretary of state or in any other office in Michigan, or paid any franchise fee to the State of Michigan, or in any way complied, or attempted to comply, with the statute above mentioned.

Upon these findings of fact the court made the following conclusions of law: 1st. The plaintiff's business, as carried on under and in pursuance of the contract, is an interstate commerce business; and the plaintiff is not subject to the aforesaid statute; and the statute, so far as it applies, or purports to apply, to foreign corporations like the plaintiff, which are doing an interstate commerce business, is in conflict with the provision of the Constitution of the United States authorizing Congress to regulate interstate commerce. 2d. The contract was made and executed in the State of Ohio, and does not provide for the transaction of any business in Michigan other than an interstate commerce business, and the plaintiff is therefore within the protection of the Constitution of the United States. 3d. The plaintiff is entitled to recover the sum of $5052.56. 68 Fed. Rep. 467.

Judgment was rendered for the plaintiff accordingly; and the defendant sued out a writ of error from this court, upon the ground that the case was one in which a law of a State was claimed to be in contravention of the Constitution of the United States, within the act of March 3, 1891, c. 517, § 5, 26 Stat. 828.

*Mr. Clark C. Wood* for plaintiff in error. *Mr. Frederick A. Maynard,* Attorney General of the State of Michigan, filed a brief on behalf of the same.

*Mr. Frederick A. Baker* and *Mr. John A. Bradley* for defendants in error. *Mr. Olin L. Sadler* was on their brief.

MR. JUSTICE GRAY, after stating the case, delivered the opinion of the court.

This action was brought in the Circuit Court of the United States for the Eastern District of Michigan, by a manufactur-

ing corporation of the State of Ohio, having its principal office and its factory at Akron in that State, against one of its commission agents, a citizen of Michigan, to recover the price of agricultural machines sold by the defendant in Michigan under a contract in writing, by which the plaintiff authorized the defendant to sell, within a certain territory in Michigan, such machines supplied to him by the plaintiff; and the defendant agreed to canvass the territory, to sell the machines at retail prices fixed by the plaintiff, to hold the unsold machines as the plaintiff's property, to keep and render accounts of sales, and to remit the proceeds to the plaintiff.

The defendant relied on a statute of Michigan of May 13, 1893, which required every foreign corporation, permitted to transact business in that State, and not having filed articles of association under its laws, to pay a franchise tax of half a mill upon each dollar of its capital stock; and further provided that "all contracts made in this State after January 1, 1894, by any corporation which has not first complied with the provisions of this act, shall be wholly void." Michigan Public Acts 1893, c. 79, p. 82.

The Circuit Court, in giving judgment for the plaintiff, held that the contract was made in the State of Ohio, and that the statute of Michigan, so far as it applied to the business carried on by the plaintiff in that State under the contract, was in conflict with the Constitution of the United States authorizing Congress to regulate interstate commerce. 68 Fed. Rep. 467.

This was therefore a "case in which the Constitution or law of a State is claimed to be in contravention of the Constitution of the United States," and was rightly brought directly to this court by writ of error under the act of March 3, 1891, c. 517, § 5. 26 Stat. 828. Upon such a writ of error, differing in these respects from a writ of error to the highest court of a State, the jurisdiction of this court does not depend upon the question whether the right claimed under the Constitution of the United States has been upheld or denied in the court below; and the jurisdiction of this court is not

limited to the constitutional question, but includes the whole case. *Whitten* v. *Tomlinson*, 160 U. S. 231, 238; *Penn Ins. Co.* v. *Austin*, 168 U. S. 685.

But this court has not found it necessary to pass upon the constitutional question, because it is of opinion that the contract is not within the statute set up by the defendant.

By the clear terms of the statute of Michigan, the invalidity of the contract does not depend upon the place where, or the time when, it is to be performed, but upon its being "made in this State after January 1, 1894." A contract made before that date is valid, although it is to be performed afterwards; and a contract made elsewhere than in Michigan is valid, although it is to be performed in this State.

A contract is made when, and not before, it has been executed or accepted by both parties, so as to become binding upon both.

This contract is admitted to have been drawn up at Laingsburgh, in the State of Michigan, where the defendant resided. It begins by stating that it is "made this 20th day of February, 1894, between" the plaintiff and the defendant; and it ends with the clause, "In witness whereof, the parties hereunto have set their hands the day and date above written." Then follows the signature, "Aultman, Miller & Co., by D. C. Gillett," who may be assumed to have been the plaintiff's local agent at Laingsburgh. That signature is followed by a stipulation, evidently addressed by the plaintiff to the other party to the contract, in these words: "This contract not valid unless countersigned by our manager at Lansing, Michigan, and approved at Akron, Ohio." Then follows the signature of the defendant, "William Holder," who thereby necessarily assents to this stipulation, as well as to the other terms of the contract. Both parties thus agreed that the contract was not to be valid, until countersigned by the plaintiff's manager at Lansing in Michigan, and also approved at Akron in Ohio, the site of the plaintiff's principal office. It further appears, upon the contract itself, that it was afterwards, on February 27, 1894, countersigned at Lansing, by "R. H. Worth, Manager," and, by an endorsement on the contract,

that it was approved at Akron, April 29, 1894, as shown by the signature of "Ira M. Milloy, Secretary."

The plaintiff, in its declaration, alleged that on February 27, 1894, at Laingsburgh and Lansing, the plaintiff "by D. C. Gillett and R. H. Worth, its duly authorized agents, entered into a written contract with the defendant." The date on which the plaintiff "entered into" the contract with the defendant is thus alleged to have been, not February 20, 1894, mentioned at the beginning of the contract as the day on which it was made, and which may have been the day on which it was signed at Laingsburgh, by Gillett in behalf of the plaintiff, and by the defendant in person; but February 27, 1894, the day on which it was countersigned at Lansing by Worth, the plaintiff's manager. The plaintiff thus assumed that the contract did not exist as a contract before it was countersigned by the plaintiff's manager at Lansing; and there is no more reason for assuming that it existed as a contract before it was approved at the plaintiff's principal office at Akron; for the stipulation above quoted required both countersigning by the manager at Lansing, and approval at Akron, to make it a valid contract. Accordingly, the declaration further alleged that "afterwards, to wit, on April 29, 1894, the said written contract was approved by the plaintiff at its office in the city of Akron, and the same then and there was and became a binding and valid contract between the defendant and the plaintiff, according to the terms thereof." The words "to wit, at the city of Lansing, in the Eastern District of Michigan," would seem to have been added by way of formal venue only, in accordance with the ancient mode of pleading in suing upon a transaction which took place abroad. As Lord Mansfield said, "no judge ever thought that, when the declaration said in Fort St. George, viz. in Cheapside, that the plaintiff meant it was in Cheapside." *Mostyn* v. *Fabrigas*, Cowper, 161, 177. See also *McKenna* v. *Fisk*, 1 How. 241, 248.

The Circuit Court found, as facts, that the parties entered into the contract on April 29, 1894, which was the date of its approval at the plaintiff's home office in Ohio; and that

it was executed, accepted and approved, as set forth therein, and in the endorsement thereon.

Whether, therefore, we look to the contract itself, to the plaintiff's declaration, or to the findings of fact by the court, it clearly appears that the contract, when, after being drawn up in writing and signed by the plaintiff's local agent, it was tendered to the defendant and assented to and signed by him in Michigan, contained a distinct stipulation that it was not valid unless, not only countersigned by the plaintiff's manager in Michigan, but also approved at the plaintiff's principal office in Ohio; and that it was on April 29, 1894, and at Akron in the State of Ohio, that the contract was approved by the plaintiff's secretary at its principal office, and then and there, for the first time, became a valid and binding contract between the parties. It cannot therefore be considered as "made," within the meaning of the statute in question, at any earlier time, or other place.

The approval at the plaintiff's home office was not a ratification by the plaintiff of an unauthorized act of one of its agents; for each of its agents, Gillett in first signing the contract, and Worth in countersigning it, appears to have acted within the strict limits of his authority. But the final approval by the plaintiff itself was an act which, according to the express stipulation of the parties, and in the contemplation of every person who affixed his signature to the paper, was a necessary step to complete the execution of the instrument by the plaintiff, and to make it a valid and binding contract between the parties.

The opinion of the Supreme Court of the State of Michigan in *Seamans* v. *Temple Co.*, cited at the bar, contains nothing inconsistent with this conclusion. It was there held that a contract of insurance, made in another State by a corporation thereof, upon an application procured through its agents in Michigan upon property in Michigan, could not be sued on in the courts of Michigan, because of provisions of earlier statutes of Michigan, making it unlawful for any foreign insurance company to transact any business of insurance in the State, and for any person to aid in any way in procuring a

policy of insurance by a foreign corporation upon property in the State. Howell's Statutes, §§ 4331, 4354, 8136. And the court said : "If it be conceded that the contract was made' in Wisconsin, and that the premiums and loss, if any, are payable. there, it is as much in contravention of the policy of this State as though it had been made and was to be performed here. It cannot be supposed that the statutes cited were intended merely to prevent the act of making the contract in this State." 105 Michigan, 400, 404.

The statute now before this court contains no such provisions as were contained in the statutes in question in that case ; but it simply invalidates "contracts made in this State" by a foreign corporation which has not filed its articles of association in Michigan and paid the franchise tax imposed by this statute.

*Judgment affirmed.*