# ST. LOUIS, IRON MOUNTAIN & SOUTHERN RAILWAY COMPANY *v.* McWHIRTER.

## ERROR TO THE COURT OF APPEALS OF THE STATE OF KENTUCKY.

### No. 541.   Argued December 4, 1912.—Decided June 10, 1913.

Where the case was decided on the Federal question, the fact that it might have been decided from a non-Federal point of view does not afford a basis for holding that it was decided on the latter ground and that this court has no jurisdiction under § 709, Rev. Stat.

While the power of this court to review the judgment of a state court is controlled by § 709, Rev. Stat., § 237, Judicial Code, yet where in a controversy of a purely Federal character the claim is made and denied that there was no evidence tending to show liability under the Federal statute, such ruling, when duly excepted to, is reviewable, because inherently involving the operation and effect of the Federal law.

It was not the intent of Congress in enacting the Hours of Service Act of 1907 to subject carriers to the extreme liability of insurers of the safety of their employés, by rendering them liable for all accidents occurring during the period of over-time whether attributable to the fact of working over-time or not.

In order to render the carrier liable under the Hours of Service Act there must be proof tending to show connection between permitting the over-time work and the happening of the accident.

In this case the evidence does not reasonably tend to connect the working over-time with the accident which occurred about seven minutes after the expiration of the permitted period.

145 Kentucky, 427, reversed.


THE facts, which involve the construction of the Hours of Service Act of 1907, and the liability of a railroad company thereunder, are stated in the opinion.


*Mr. R. P. Railey,* with whom *Mr. M. L. Clardy* and *Mr. E. T. Bullock* were on the brief, for plaintiff in error.

*Mr. William V. Eaton,* with whom *Mr. Aubrey Everett Boyd* was on the brief, for defendant in error.

MR. CHIEF JUSTICE WHITE delivered the opinion of the court.

The record in this case is confusedly arranged, and numerous matters are pressed in argument which we deem to be irrelevant. Not following the various steps by which the petition as originally filed and the answer were both frequently amended, the case as finally put at issue was as follows: The defendant in error as administratrix of the estate of her husband Etwal McWhirter, sued the plaintiff in error, for the benefit of herself and her four infant children, to recover damages alleged to have been suffered by the death of McWhirter. It was alleged that the deceased was employed as a flagman by the defendant company and that he was doing that work on an interstate commerce freight train when he was run over and killed by the train on which he was serving. The death was alleged in general terms to have resulted from the wrongful and negligent acts of the conductor and engineer in charge of the train and by the negligent and wrongful acts of the train dispatcher and higher officers of the defendant company. It was moreover alleged that the deceased "had been permitted and required by the officers and agents of the defendant to be and remain on duty for a longer period than sixteen consecutive hours, next before the aforesaid accident, and in violation of Chapter 2939, section 2, 34 Stat., 1415, of the acts of Congress of the United States relating to interstate commerce, and being a part of an act entitled 'An Act to Promote The Safety Of Employés And Travelers Upon Railroads By Limiting The Hours Of Service Of Employés Thereon,' which became a law on the 4th day of March, 1907, and also an act entitled 'An Act Relating To The Liability Of Com-

mon Carriers By Railroad To Their Employés In Certain Cases,' which became a law on the 22nd day of April, 1908 (35 Stat. 65, c. 149); and that the aforesaid negligent and wrongful acts of the officers and agents of the said defendant, and the said violation of the laws of the United States relating to interstate commerce were the proximate and sole causes of the death of her said husband, and she relies on the laws of the United States made and provided in such cases."

The answer of the defendant company denied the charges of negligence of its officers and other employés, admitted the death of McWhirter at a date and hour which was specified while employed as alleged in the petition, and stated facts which it was charged established that the death was an unavoidable accident for which the company was not responsible. It, besides, averred there was no right to recover because of an alleged written contract of assumption of risk entered into by the deceased and the company at the time he entered its service several years before the happening of the accident.

The case was tried to a jury. During the course of the trial both sides made various objections to evidence and exceptions were taken to testimony offered. All the evidence upon which the case was tried is in the record. Leaving aside trivial matters having no tendency to affect the result, the entire case, as to negligence, was this: The defendant operates a line of railroad through the States of Missouri and Illinois, and Illmo is a station on the main line in Missouri, and Bush a station on a branch line in Illinois, the branch diverging from the main line at a station in Illinois called Gorham. On the afternoon of February 22, 1910, at 3:30, a train of empty coal or freight cars was started from Illmo, destined for Bush for the purpose of being loaded with coal and returning. The train reached Bush about 11:30 that night. It there either loaded some of the empties with coal or exchanged some

for loaded cars. Exactly how long a time the operations at Bush consumed is not precisely fixed, one witness saying an hour, and another an hour and a half, and the same divergence exists as to the hour of departure on the return journey, one witness saying 12:30 and the other one o'clock. Gorham, where the branch line connects with the main line is about twenty miles from Bush. When the train reached that point on the return trip is not shown. Certain it is, however, that judging by the average speed of the train somewhere about 6:15 the train passed a station called Howardtown, where there was a siding, and found itself at either 7:35 or 7:37 drawing into a station called Wolf Lake which is fifteen miles from Gorham and thirty-five miles from Bush. The proof as to what then took place is contained in the testimony of three witnesses. Guess, the engineer of the train, Roberson the telegraph operator who was stationed at Wolf Lake, and Loper the conductor of the train.

Omitting as a general rule questions and answers except where it may be thought important to reproduce them, we state in narrative form the entire testimony of the first two of these witnesses and make such reference to the third (Loper) as has any bearing upon the happening of the accident.

The engineer testified, as a witness for the plaintiff, as follows:

"I have been employed as an engineer three years by the St. Louis, Iron Mountain and Southern Railway Company, for a longer period than that was a fireman. At Illmo, Missouri, I was called out on the afternoon of February 22, 1910, at 3:30 o'clock as near as I can remember. The crew of the train was as follows: Loper, conductor, flagman Mansker, brakeman McWhirter and fireman Edmiston. The train was going to Bush in Illinois. Bush is on a branch line which runs from Gorham to Bush. I do not recollect what hour we arrived at

Gorham, but we changed from the main to the branch line. The train going up to Bush consisted of nine empties, a freight train. We stayed about an hour at Bush. We set out the train of empties, and turned the engine. It took about an hour to make the transfer at Bush. We came back to Gorham, going south towards Illmo. McWhirter was killed, returning, at Wolf Lake, on the morning of February 23, at 7:35 as near as I can remember. It was in that neighborhood. He was killed performing his duty, going out to set a switch.

Question. Just detail the manner as it occurred, as you know it?

Answer. As I came into Wolf Lake, when I whistled for town, brakeman McWhirter asked me if I were going to head in at Wolf Lake. I told him yes, that we had to get in on account of the sixteen-hour law. He got up, went out at the front window on the left side of the engine along the footboard, and the next thing I seen was the operator at Wolf Lake very much excited in giving a stop signal. I stepped off of engine, asked him what was the matter. He said, 'My goodness you have run over the brakeman.' I went looking for him, found him under the left tank wheel, cut in two.

Q. Did you know this brakeman was in front of the engine?

A. No, sir.

Q. Did you see him go out of the cab window?

A. I seen him go out of the cab window. That is all.

Q. What did you suppose he went out of the cab window for?

A. He is supposed to get out there to open the switch. I supposed that is what he went out there for.

Q. Was it his duty to throw the switch in front of the window or not?

A. No, sir, it wasn't his place to throw it in front of the window. He wasn't supposed to go out on that pilot.

Q. What I mean is was the switch that the brakeman was required to throw in front of the engine or behind of the engine?

A. It was in front of the engine. I have no record that would show the minute that the train arrived at Wolf Lake on the morning of the 23d. I testified before the Coroner's jury. As near as I can remember I stated at the Coroner's inquest that the train arrived at Wolf Lake at 7:35. That would make five minutes over the sixteen-hour law.

Q. You stated before the Coroner's inquest 'at 7:30 the sixteen-hour law was up. We were seven minutes over time.' Was that correct?

A. I suppose so. As near as I can remember it was five minutes. It was 7:35. If I said 7:37 that was correct. Then I knew it. It has been over a year ago now. Neither cylinder of my engine was bad, more than ordinarily. It wouldn't make any difference in this case. Neither was leaking steam. I was not working steam when he was killed. The engine was drifting. Understand, shut off, there would be no leak there. Neither cylinder had been leaking steam that morning. There had not been anything the matter with the engine on this return trip. Nothing at all.

Q. Who saw this man run over?

A. Mr. Roberson was the only man I can say. Mr. Fred Roberson. He was standing on the platform. The train was going out to Wolf Lake. Destination was Illmo.

The crew of my train did not go any further than Wolf Lake. There was another crew that came to relieve us there."

On cross-examination the witness testified:

"McWhirter knew of our purpose to head in at Wolf Lake, for I told him that we were going to head in on account of the sixteen-hour law. Wolf Lake was the first

switch or place which we could enter at the expiration of the sixteen-hour law. It was McWhirter's duty as brakeman to throw the switch.

Q. When was the first time that you knew of the unfortunate accident?

A. When Mr. Roberson told me what had happened.

Q. Whom do you mean by Mr. Roberson, who was he?

A. The telegraph operator at Wolf Lake."

On re-direct examination the witness said:

"It is about in the neighborhood of fifteen miles from Wolf Lake to Gorham, and about six miles from Wolf Lake to Howardtown. There is a switch at Howardtown. There was no defect in the pilot step and I know nothing about how this accident happened except from the fact that the telegraph operator told me that something was wrong."

F. A. Roberson, a witness for the plaintiff, testified as follows:

"I am employed as a telegraph operator by the St. Louis, Iron Mountain & Southern Railway Company, and have been so employed since July, 1904. I was stationed, as operator, at Wolf Lake on February 22, 1910. I was at the station on the morning of the 23rd of February when extra train No. 503 came into Wolf Lake from the north. I saw the train when it pulled in. It was about 7:37 as well as I recollect by the time it got to the depot.

Q. Just tell what you know about the accident that happened at Wolf Lake on that morning?

A. As I was sweeping out the office, I heard an engine coming. I looked out of the window and saw it was an extra south—saw it was a train coming south—didn't know it was an extra. I seen they were stopping and I wondered what they were stopping for and went ahead sweeping. When they came in close to the office I went out and was standing on the platform. I saw a man leave the cab window and come down the left running board

and came down to the pilot, and as it was nearing the switch he left the pilot and struck the ground running and the next I saw he fell face downward between the rails. I next saw him on his hands and knees. After that I turned my eyes to the engineer and did not see him any more, giving the engineer a stop signal. When he came to a stop I told the engineer something, but I do not remember what I told him, but that was the last I saw of the brakeman until he was taken from under the tender of the engine.

He was dead when he was taken out from under the engine. The weather was pretty cold—weather chilly, cold. As near as I can remember, the ground was frozen. I do not remember that there was any ice and sleet on the ground.

Q. Do you know how this man came to fall?

A. I do not.

There were cinders between the rails where he was, ashes between the rails, a little higher than the other ground about the place he was killed. I believe they were frozen. I do not recollect whether it had been raining on the night of the 22nd—not that I remember of it raining. I do not think any one else saw McWhirter at the time he was killed—not at the office. At that time there was no one else around there except the train crew on this freight train.

The remainder of the testimony of the witness is as follows:

"Q. When you saw McWhirter's perilous condition you say you turned your head. Why did you do that?

A. I don't remember saying I turned my head. I turned my eyes from the brakeman to the engineer.

Q. Did you know that he was in a condition to be hurt?

A. I didn't positively know so, but I thought he was in a dangerous condition down there.

Q. How far did the train run before the engineer stopped it after you notified him of this trouble?

A. I suppose about the length of an engine. Maybe not quite so far, maybe a little further. I don't remember.

Q. Do I understand you to say that Mr. McWhirter left the engine, passed down over the pilot and was out on the ground when you saw him?

A. He was on the ground when I saw him.

Q. How far was he from in front of that engine when he fell?

A. That is pretty hard for me to judge because he was in line of the engine and myself.

Q. How far was it from where he fell to the switch which he was called on to turn?

A. Perhaps three or four car lengths, maybe not so far.

Q. How far is a car length—how many feet?

A. That is pretty hard for me to say.

Q. How long is a car?

A. Well, they ordinary run thirty-six feet, some of them thirty, some of them forty.

Q. Now, when you saw him fall how far was he from this switch?

A. About three car lengths. About three car lengths."

Redirect examination by Mr. E. Boyd, counsel for plaintiff:

"Q. You say that at the time McWhirter fell he was in line with you and the engine. Explain what you mean by that?

A. In direct with me—between where I stood and where he got off putting me in direct line with him and where he got off. I can't tell whether he was ten, twenty or how far he was from the engine.

Q. You mean, if I understand you, that the train was coming towards you and he stepped off between you and the engine, is that correct?

A. That is correct.

Q. Do you know whether or not the cylinder heads of this engine were leaking?

A. I couldn't say whether it was the cylinder heads or not. I recollect there was some steam or other from the engine.

Q. Steam was escaping?

A. Steam was escaping from the engine, as well as I recollect."

Cross-examination by Judge E. T. Bullock, counsel for defendant:

"Q. Do you know what caused that?

A. I do not."

As to the testimony of conductor Loper, it suffices to say that he swore he was in the caboose and saw nothing of the accident, although he knew it occurred as the train was entering the station at Wolf Lake at 7:37 in the morning. When examined as a witness for the plaintiff he testified on cross-examination that at the time of the accident the train could not have been going more than two miles an hour because they stopped at an "engine's length," while when called to the stand as a witness for the railroad company he testified on cross-examination that at the time of the accident the train was going "about three or four miles an hour." Loper also testified that the night of the twenty-second of February, 1910, was a cold night, freezing, and the ground was frozen; that at the expiration of the sixteen hour limit the train was probably two miles from Wolf Lake, which was the first switch on the expiration of that limit.

At the close of all the evidence the defendant requested the court to instruct the jury to find in its favor. The court refused to do so, and an exception was noted. There were many other requests to charge asked by the respective parties, some of which were given and some of which were refused and exceptions taken.

There was a verdict and judgment for the plaintiff. The

Court of Appeals affirmed the judgment.  145 Kentucky, 427. , Among other things, the court held that there was testimony tending to show negligence, and therefore the binding instruction to the contrary asked by the defendant was rightly refused, and that an instruction as to the operation and effect of the Hours of Service Act was also correct.

We must first dispose of a motion to dismiss which was made and postponed to the hearing on the merits. It rests upon the ground that the case as made by the pleadings presented two distinct causes of action—one at common law irrespective of the statutes of the United States and the other under those statutes, and that the former cause of action was sustained and affords a basis broad enough to support the judgment irrespective of what may have been decided concerning the statutes of the United States. The contention wants foundation in fact.  As we have seen the pleadings in express terms exclusively based the right to relief upon the statutes of the United States and no non-Federal ground was either presented below or passed upon.  It is true that although the case was exclusively rested upon Federal statutes, as it comes here from a state court, our power to review is controlled by Rev. Stat., § 709, and we may therefore not consider merely incidental questions not Federal in character, that is, which do not in their essence involve the existence of the right in the plaintiff to recover under the Federal statute to which his recourse by the pleadings was exclusively confined, or the converse, that is to say, the right of the defendant to be shielded from responsibility under that statute because when properly applied no liability on his part from the statute would result.  *Seaboard Air Line Ry.* v. *Duvall,* 225 U. S. 477; *St. Louis, I. M. & S. R. Co.* v. *Taylor,* 210 U. S. 281.  And of course as the cause of action alleged was exclusively placed on the Federal statute and the defense therefore alone involved; determining

whether there was liability under the statute, the mere statement of the case involved the Federal right and necessarily required, from a general point of view, its determination. *Swafford* v. *Templeton*, 185 U. S. 487. If as is inferable from the argument, reliance is placed on the ruling of the court below that there was evidence tending to show negligence on the part of the engineer for the purpose of establishing that even if a Federal question was passed upon the case was also decided on an independent non-Federal ground broad enough to sustain the judgment, the proposition is without merit. The mere ruling that there was evidence sufficient to authorize consideration of the case from the point of view of negligence alone, affords no basis for saying that the case was decided on such ground. Mere conjecture may not be indulged in for the purpose of concluding that because there was a potentiality of considering the case from a non-Federal point of view, therefore it was considered and decided in that aspect. But it was long since pointed out in *Neilson* v. *Lagow*, 12 How. 98, the court speaking through Mr. Justice Curtis, that to admit that the authority to review the action of a state court where it has decided a Federal question can be rendered unavailing by a suggestion "that the court below may have rested its judgment" on a non-Federal ground, would simply amount to depriving this court of all power to review Federal questions if only a party chose to make such a suggestion. But, aside from this, the argument, when rightly considered, reduces itself to this, that the power to review a Federal question which has been expressly decided by a state court does not obtain where such court has also decided another Federal question. This is true since the finding that there was some evidence to go to the jury on the subject of negligence independently considered was necessarily a ruling against the binding instruction asked at the close of the testimony upon the assumption that there was nothing adequate to

go to the jury to show liability under the Federal law. While it is true, as we have said, that coming from a state court the power to review is controlled by Rev. Stat., § 709, yet where in a controversy of a purely Federal character the claim is made and denied that there was no evidence tending to show liability under the Federal law, such ruling, when duly excepted to, is reviewable, because inherently involving the operation and effect of the Federal law. *Kansas City So. Ry.* v. *Albers Commission Co.*, 223 U. S. 573, 591; *Creswill* v. *Knights of Pythias*, 225 U. S. 246.

The plaintiff in error assigns twenty-two alleged errors. We deem it necessary only to refer to those which concern the following subjects: First, the refusal to give the binding instruction asked by the defendant; and, second, an instruction given over the objection and exception of the defendant concerning the act of Congress commonly known as the Hours of Service Act, and in connection therewith a special charge on the same subject, given by the court of its own motion, which was excepted to by both parties.

Let us first consider the interpretation and effect given to the Hours of Service Act as a result of the instructions of the trial court and the action of the court below in approving the same. The instructions given by the trial court were as follows:

"The Court further instructs the Jury that if you shall believe from the evidence that the said Etwal McWhirter had been permitted or required to be or remain on duty continuously for more than 16 consecutive hours next before the accident which caused his death, then the defendant was negligent and liable in damages for said injury and death of Etwal McWhirter, if you shall believe from the evidence that the permitting or requiring the said Etwal McWhirter to be or remain on duty continuously for more than 16 consecutive hours next before his death in any way contributed to the said accident and

death, you will find for the plaintiff such damages as you
may believe from the evidence she has sustained by reason
of his death, not exceeding the sum of $25,000.

"The Court instructs the jury that unless they believe
from the evidence that Etwal McWhirter came to his
death on account of the carelessness or negligence of the
officers, agents and servants of the defendant, or that said
McWhirter was permitted or required by the defendant
to be on duty more than sixteen hours consecutively next
before his death, and that his being permitted or required ·
to be on duty more than sixteen hours next before his
death contributed to his death, the law is for the defendant
and the jury should so find."

The Court of Appeals, after reviewing the evidence as
to the happening of the accident and stating that it was
patent "that it occurred after more than sixteen consecu-
tive hours of continuous service by the intestate on the
train," said:

"In thus requiring of the intestate more than sixteen
consecutive hours of service, albeit the excess of service
over the sixteen hours was but five or seven minutes, ap-
pellant violated the statute, *supra;* and as the death of the
intestate, from the act of its engineer complained of, oc-
curred while he was engaged in the required continuous
service and after the expiration of the sixteen consecutive
hours allowed by the statute, there seems to be no escape
from the conclusion that the act of appellant in thus ex-
tending his service beyond the statutory limit was neg-
ligence *per se,* to which the intestate's death must, as a
matter of law, be attributed, and, if so, the right of appellee
to maintain this action cannot be questioned."

Further declaring that if the right to recover depended
alone upon the ability to show that the death of McWhirter
was caused by the negligence of the engineer, there was
evidence tending to prove such negligence, the court said:

"Recurring to the appellant's violation of the provisions

of the statute prohibiting it from requiring its employés to remain on duty longer than sixteen consecutive hours, we find that the language of the provision in question is mandatory and that the duty it imposes is a definite, absolute duty. Its non-performance may not, therefore, be excused by a showing on the part of the railroad company that it used ordinary care or reasonable diligence to perform it, but was unable to do so. The violation of such a statutory duty is, therefore, negligence *per se.*"

And these positive conclusions were deemed to be further reinforced by a citation of decisions of this court enforcing the imperative duty of carriers to maintain in good order all appliances required by the Safety Appliance Act, the court saying:

"The requirements of the statute with respect to the safety appliances to be used on appellant's trains, are no more imperative or mandatory than is the statutory restriction here involved upon its right to suffer its employés to engage in its service more than sixteen consecutive hours. The violation of the statute in either case invites the penalty prescribed, and the offender will not be excused upon a showing of reasonable effort or diligence in attempting to comply with the statutory requirements."

Giving to the views thus expressed by the court, their natural significance, there would seem to be little doubt that it was intended to hold that the effect of the violation of the Hours of Service Act was to create an unconditional liability for all accidents happening during the period beyond the statutory time irrespective of proof showing a connection between the accident and the working over time. In other words, the ruling was that by operation of law the carrier is an insurer of the safety of all his employés while working beyond the statutory time. And it is true also to say that although the instructions given by the trial court may not have as explicitly stated the doctrine as did the Court of Appeals, nevertheless such

instructions rested upon the same interpretation of the
statute for the following reasons: *a*, because beyond the
proof of working over time there was no offer of proof con-
necting the accident with the working over time, and, *b*,
because it is apparent that the Court of Appeals inter-
preted the charge upon which it was passing as having that
significance and affirmed it for that reason.

In giving to the statute the construction above stated
we think error was committed. The Hours of Service Act
was approved March 4, 1907, and is entitled "An Act to
promote the safety of employés and travelers upon rail-
roads by limiting the hours of service of employés thereon."
Chapter 2939, 34 Stat. 1415. We are unable to discover
in the text of the statute any support for the conclusion
that it was the purpose of Congress in adopting it to sub-
ject carriers to the extreme liability of insurers which the
view taken of the act by the court below imposes. We
say this because although the act carefully provides pun-
ishment for a violation of its provisions, nowhere does it
intimate that there was a purpose to subject the carrier
who allowed its employés to work beyond the statutory
time to liability for all accidents happening during such
period without reference to whether the accident was at-
tributable to the act of working over time. And we think
that where no such liability is expressed in the statute it
cannot be supplied by implication. It requires no reason-
ing to demonstrate that the general rule is that where
negligence is charged, to justify a recovery it must be
shown that the alleged negligence was the proximate cause
of the damage. The character of evidence necessary to
prove such causation we need not point out, as it must
depend upon the circumstances of each case. Conceding
that a case could be presented where the mere proof of
permitting work beyond the statutory time and the facts
and circumstances connected with an accident might be
of such a character as to justify not only the conclusion

of negligence, but also the inference of proximate cause, such concession can be of no avail here, since the instruction of the trial court and the ruling affirming that instruction were based upon the theory that the mere act of negligence in permitting an employé to work beyond the statutory period created liability irrespective of the connection between the alleged negligence and the injury complained of.

It is to be observed, however, that even if for the sake of argument the broad expressions of the court below and those of the trial court be so limited as to justify the conception that it was only intended to decide that permitting the working beyond the statutory time was negligence *per se*, giving rise to liability only where the proof showed a causal connection between the injury complained of and such *per se* negligence, the concession would not avoid the Federal question or remove the error. We say this, because indulging in the assumption stated, would render it necessary to determine, as previously pointed out, the Federal question whether there was any evidence tending to show a connection between the asserted negligence and the occurrence of the accident; that is, whether the plaintiff had offered any proof tending to show the existence of the Federal right which was asserted or conversely speaking whether there was any proof tending to establish that the defendant was liable within the terms of the statute—considerations as the right on the one part of the plaintiff, or the immunity on the other part of the defendant, depended exclusively upon the statute, were, in the nature of things both necessarily Federal—since they were from the point of view of the statute correlative. Assuming then that as the result of the hypothesis we have indulged in, the case is reducible to the Federal question last stated, we are clearly of the opinion that as there was no proof tending to show a connection between the permitting of the working beyond the statutory time,

and the happening of the accident, reversible error was committed. Of course the inquiry whether there was any proof having such tendency is not to be solved by indulging in mere surmise or conjecture, or by resorting to imaginary possibilities, for to so do would but resolve the question back to the generic rule of liability as insurer which we have previously disposed of.

Our conclusion that there was no reasonable tendency in the evidence connecting the permitting of the working over time with the accident may be briefly thus summarized: First, because we think there is nothing in the proof concerning the action of the deceased from which an inference could be drawn, that his jumping from the pilot of the slowly moving engine was in any way caused by the fact that he had been working over time; second, because we think there was no proof tending to show negligence on the part of the engineer and therefore obviously no room to conclude that the fact that he had worked over time negligently contributed to the accident, for the following reasons: a, because of the uncontradicted testimony of the engineer and of the telegraph operator whose signal was immediately seen and caused the engineer to stop the train within a car length; b, because of the testimony of the operator as to the position of the brakeman when he leaped from the pilot to run towards the switch, of his statement as to the line of vision from where he stood and the brakeman and engineer, the short interval which elapsed, the place where the brakeman in rising after falling was struck by the locomotive as shown by the distance the engine traveled before it came to a stop and the place where the body was found. Indeed, irrespective of the testimony of the telegraph operator, we think, when the natural position of the engineer on the right side of the cab is considered, of the position in which it is unquestionably shown the deceased was, of the short distance which the train moved before it was stopped after

the signal from the operator, it is demonstrated with mathematical certainty that the deceased was not within the possible vision of the engineer as he leaped or stepped from the pilot for the purpose of running along the track to the switch.

The judgment of the Court of Appeals of Kentucky must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

MR. JUSTICE PITNEY, dissenting.

It seems to me that the rulings of the state court, held to be erroneous, are not within the scope of our review under the act (Rev. Stat., § 709; Jud. Code, § 237) that alone confers jurisdiction upon this court to review the judgment of a state court.

The action was based upon the Hours of Service Act of March 4, 1907 (34 Stat. 1415, 1416, c. 2939, § 2), and upon the Employers' Liability Act of April 22, 1908 (35 Stat. 65, c. 149), and the verdict and judgment rest upon the theory that plaintiff's intestate, Etwal McWhirter, a flagman or brakeman upon one of defendant's interstate trains, had been kept continuously at work for more than sixteen consecutive hours, in violation of the former act, and that his death was directly due to the negligence of the locomotive engineer upon the same train, either alone or in conjunction with McWhirter's excessive fatigue due to his having been worked overtime. The negligence of the engineer was of course attributable to the defendant under the act of 1908, and under that act the negligence of the deceased, if shown, would not bar the action.

As I read the record the trial judge instructed the jury to the effect that the violation of the Hours of Service Act created no liability unless there was a causal relation

between the working overtime of the deceased and the catastrophe that resulted in his death. And so, I think, the Court of Appeals of Kentucky interpreted the instructions (145 Kentucky, 427, 441; Instructions 4 and 5).

However, let it be conceded, for present purposes, that the trial court erroneously instructed the jury that the effect of the violation of the Hours of Service Act was to create an unconditional liability for an accident happening after the expiration of the 16-hour limit, and to render the carrier an insurer of the safety of the employé while working beyond the statutory time. And let it be further conceded that the trial court held, and erred in holding, that there was enough in the evidence to warrant a finding that the locomotive engineer was negligent, so as to make the carrier liable under the Employers' Liability Act; or held, erroneously, that there was enough to show a causal relation between the working overtime of McWhirter and the disaster, so as to create a liability under the Hours of Service Act.

It still does not seem to me that the state courts, in overruling defendant's objections to the instructions referred to, or in denying the motion (and sustaining such denial) for direction of a verdict in defendant's favor, decided *against* any "title, right, privilege, or immunity specially set up or claimed" by the defendant under the Constitution or laws of the United States, within the meaning of § 709, Revised Statutes; Judicial Code, § 237. It was the plaintiff in the trial court (now defendant in error) who alone claimed under the laws of the United States. The attitude of the defendant was that of merely denying the validity of her claims. And the rulings of the state court (as is conceded, for argument's sake) erroneously imposed upon the defendant a greater responsibility than those laws warranted; in other words, gave too great force to the Federal statutes. The questions thus raised were undoubtedly Federal questions in

the general sense; that is to say, they arose under the laws of the United States. And I concede that the judgment cannot be sustained upon any independent non-Federal ground. But according to all previous decisions, so far as I am aware, the mere existence of a Federal question in the record is· not sufficient to give to this court jurisdiction to review the judgment of a state court; it is necessary that the Federal question shall have been decided in a particular way.

There is a clear distinction between the existence of a Federal question such as would give original jurisdiction to a Federal court because "arising under the Constitution or laws of the United States," etc. (Judicial Code, § 24), or such as would give a right of appeal to this court from those courts (§§ 238, 241), and the *denial* by a state court of a Federal right or immunity, under such circumstances as to give jurisdiction to this court to review the state court's decision.

Section 237, Judicial Code, formerly § 709, Rev. Stat., authorizes a review by this court of the final judgment of the court of last resort of a State only "where is drawn in question the validity of a treaty, or statute of, or an authority exercised under, the United States, and the decision is· *against* their validity; or where is drawn in question the validity of a statute of, or an authority exercised under, any State, on the ground of their being repugnant to the Constitution, treaties, or laws of· the United States,·and the decision is *in favor of* their validity; or where any title, right, privilege, or immunity is claimed under the Constitution, or any treaty or statute of, or commission held or authority exercised under, the United States, and the decision is *against* the title, right, privilege, or immunity especially set up or claimed by either party, under such Constitution, treaty, statute, commission, or authority."

Unless the emphatic words—"*against* their validity"—

"*in favor of* their authority"—"*against* the title . . . or immunity *especially set up*," etc.—are to be eliminated from the section, it must be construed as giving, not a mutual or reciprocal right of review of Federal questions decided in the state courts, but an unilateral right of review, dependent upon the way in which the question was decided in the state court.

The distinction has been recognized by this court in cases without number. See *Whitten* v. *Tomlinson,* 160 U. S. 231, 238; *Penn Mutual Life Ins. Co.* v. *Austin,* 168 U. S. 685, 695; *Holder* v. *Aultman,* 169 U. S. 81, 88; *Field* v. *Barber Asphalt Co.,* 194 U. S. 618, 620.

The terms of § 237, Judicial Code, are not new. Except for using the word "*especially*" instead of "*specially*" the jurisdictional clause is identical with the corresponding clause in § 709, Rev. Stat., under which it has been uniformly held that this court has no general power to review or correct the decisions of the state courts, and is authorized only to protect against alleged violations in state court decisions of rights arising under the Federal authority; that it was not the purpose of Congress to authorize a review by this court whenever a Federal question is decided in a litigation in a state court, but was to prevent the state jurisdictions from impairing or frittering away the authority of the Federal Government by failing to give full force to the statutes, etc., established by that Government; and that therefore the writ of error will lie only when the decision is adverse to the Federal right asserted in the state court by the plaintiff in error; and that a decision in the state jurisdiction upon a Federal question, however erroneous the decision may be, is not to be corrected in this court if the decision be in favor of the right or immunity that is set up under the Federal authority. *Montgomery* v. *Hernandez* (1827), 12 Wheat. 129, 132; *Hale* v. *Gaines* (1859), 22 How. 144, 160; *Murdock* v. *City of Memphis* (1874), 20 Wall. 590, 626; *Mis-*

*souri* v. *Andriano,* 138 U. S. 496, 499; *Jersey City & Bergen
R. Co.* v. *Morgan,* 160 U. S. 288, 292; *DeLamar's Nevada
G. M. Co.* v. *Nesbitt,* 177 U. S. 523, 528.

In all these cases the word "immunity," as used in § 709,
Rev. Stat., like the associated words "title, right, privi-
lege," has been given its normal affirmative force; the
clause meaning not that the plaintiff in error may have
merely denied a Federal right asserted against him by his
adversary, but that he must have claimed exemption
from a liability or obligation asserted against him on
grounds of state or of Federal law, by *specially setting up*
an immunity because of some statute, or treaty, or con-
stitutional provision of the United States.

The more recent decisions that are sometimes sup-
posed to have given a different construction to § 709,
do not, upon critical examination, bear out this view.
*Nutt* v. *Knut,* 200 U. S. 12, 19, and cases cited; *Texas
Pacific Ry.* v. *Abilene Cotton Oil Co.,* 204 U. S. 426, 434,
etc.; *Kansas City Southern Ry.* v. *Albers Commission
Co.,* 223 U. S. 573, 591; *Creswill* v. *Knights of Pythias,*
225 U. S. 246; *Seaboard Air Line Ry.* v. *Duvall,* 225 U. S.
477. An apparent exception is *St. Louis, Iron Mountain
& S. Ry.* v. *Taylor,* 210 U. S. 281, 291, etc. But in that
case the plaintiff in error did at least assert a special con-
struction of the Federal act upon which its adversary's
suit was based, and upon that special construction claimed
an exemption from liability.

I am unable to find in § 709, or in previous decisions of
this court, any authority for a review by this court of a
decision by a state court sustaining a defendant's liability
in an action founded upon a Federal law, although such
decision be excepted to; or for reviewing a state court de-
cision that, instead of impairing or limiting the effect of
an act of Congress, is alleged to enlarge its scope and effect
and the consequent responsibility of a defendant there-
under.